605 A.2d 1073

LAKE SHORE ESTATES, INC., A NEW JERSEY CORPORATION, PLAINTIFF–APPELLANT, v. DENVILLE TOWNSHIP PLAN-NING BOARD, MAYOR AND MUNICIPAL COUNCIL OF THE TOWNSHIP OF DENVILLE, AND TOWNSHIP OF DENVILLE, DEFENDANTS–RESPONDENTS.

Argued January 6, 1992—Decided April 16, 1992.

*Lawrence S. Berger* argued the cause for appellant (*Berger & Bornstein,* attorneys; *Bernd E. Hefele* and *Robert A. Born-stein,* on the brief).

*Joel A. Murphy* argued the cause for respondents (*Murphy and Kurnos,* attorneys).

PER CURIAM.

The judgment is affirmed, substantially for the reasons expressed in the opinion of the Appellate Division, reported at 255 *N.J.Super.* 580, 605 *A.2d* 1106 (1991).

O'HERN, J., dissenting.

I would reverse the Appellate Division's judgment and reinstate the judgment of the Law Division. There is no legal impediment to that result. The "time-of-decision" rule is a rule of reason and justice. There comes a time when government can no longer change the rules for land-use applicants.

## I

This case is now almost twenty years old. I attempt herewith to draw the most salient events from the history recounted in plaintiff's brief. Although all the details may not be exactly in place, the general outline should encourage us to defer to the views of the Law Division.

Plaintiff-landowner first discussed the possibility of developing its 140–acre tract of land with municipal officials in 1973. The property is located on a slope. In 1976, plaintiff submitted an application for cluster zoning of the property, a technique that conserves land and addresses environmental concerns. It received "sketch plat" approval for 146 homes in 1977 and drew up more detailed plans that were needed for the application's formal approval.

Denville adopted its first "steep-slope" ordinance in 1979. Plaintiff sought a variance from the ordinance's terms. Five years later, in 1984, the Planning Board denied plaintiff relief from the ordinance and denied its subdivision application. Following a remand to correct a procedural deficiency, the Planning Board's decision was made final in 1985. Plaintiff sought judicial review of the municipal action. The Law Division found the steep-slope ordinance to be unconstitutional. In a February 1986 decision, the court asked that plaintiff submit a "clean, fresh application" to the Planning Board.

Plaintiff spent $50,000 on new engineering costs and resubmitted its application for approval of a subdivision of plaintiff's property into 100 single-family home lots on August 6, 1986. The previous day, however, Denville had passed a modified version of its steep-slope ordinance. After plaintiff filed a challenge to the ordinance in September 1986, Denville rezoned plaintiff's property from one acre to two acres, thus reducing the number of homes from 100 to approximately 50. The Law Division ruled on appeal in March 1987 that to apply the new steep-slope ordinance and the two-acre zoning to plaintiff's property would place an unfair burden on plaintiff. The court ordered that plaintiff's application be remanded to the Planning Board for further review.

In May 1987, the Planning Board denied plaintiff's application on the basis that the concept of "cluster zoning" was inappropriate for the site. After being denied a fair hearing on that issue, plaintiff again sought judicial review in December 1987.

In March 1988, the Law Division agreed that plaintiff had not been afforded a fair hearing on the cluster-zoning issue and remanded the matter to the Planning Board to conduct a hearing on whether cluster development was appropriate.

The Planning Board again denied plaintiff's application for cluster zoning in June 1988. The Law Division upheld that decision and directed that the Planning Board finally resolve the subdivision application without consideration of the steep-slope ordinance and two-acre zoning. Both parties appealed to the Appellate Division: plaintiff appealed the denial of its cluster-zoning application, and the municipality appealed the Law Division's decision concerning the application of the steep-slope ordinance and two-acre zoning. The Appellate Division reversed, holding that the trial court erred when it prohibited the Planning Board from requiring compliance with the steep-slope and two-acre zoning ordinances. The Appellate Division dismissed the cluster-zoning issue as moot. We granted plaintiff's petition for certification, 126 *N.J.* 335, 598 *A.*2d 892 (1991).

## II

The only issue raised on appeal is whether the trial court exceeded its powers by directing the Planning Board to consider the applications without regard to the provisions of the steep-slope ordinance and two-acre zoning. Recall that at no time had the Law Division ousted the Board of its responsibility to oversee production of a safe and environmentally-sound plan for development of the land. All that it had asked was that the Board decide the merits of the application within the parameters of the case.

No one disputes the legal principles that are applicable. The court's reasoning in its 1987 decision fully explains why there is no departure from the so-called "time-of-decision" rule. That rule is ultimately a rule of just application.

The court's 1987 opinion fully articulates its reasoning:

I'm satisfied that within the meaning of the broad spirit and principle of cases, such as *Kruvant* versus *Mayor and Council of the Township of Cedar Grove,* 82 New Jersey 435[, 414 *A.*2d 9], decided in 1980, and cases such as *Oakwood at Madison, Inc.* versus *Township of Madison,* 72 New Jersey 481 [371 *A.*2d 1192], decided in 1977, and *Urban Farms, Inc.* versus *Franklin Lakes,* 179 New Jersey Superior Court Reports 203 [431 *A.*2d 163] decided by the Appellate Division in 1981, I'm satisfied that within the meaning of the rules promulgated by those decisions, it's an unfair and inequitable burden on this plaintiff to subject it to a new steep slope ordinance.

And I will direct that its application may not be reviewed under the terms of the now existing steep slope ordinance of the Township of Denville or, of course, under the terms of the previous ordinance which I invalidated earlier in this action.

Now, I note that there are, of course, important differences between our present case and the three cited cases, *Kruvant, Oakwood at Madison* and *Urban Farms.*

But the basic concept of treating a developer fairly, of not bouncing applications around, not changing rules in the middle of the game, of not making it impossible to get an expeditious decision, of not penalizing people when they in good faith go to Court and assert their rights, those principles are involved in our case as they were in the three cited cases.

Also the principle of treating the public fairly in terms of giving the public the benefit of expeditious and economic review procedures, in terms of treating the Court in a sense fairly, all these things are implicated in our present case as they were in the three cited cases.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

I am satisfied that the principles contained in the three cases which I have previously cited, namely *Kruvant versus Mayor and Council of the Township of Cedar Grove, Oakwood at Madison, Inc.* versus *Township of Madison* and *Urban Farms* versus *Franklin Lakes,* those cases really lead me to conclude that to apply this new zoning change to the plaintiff's property would be fundamentally unfair.

The plaintiff has been working fairly with the municipal authorities and with the courts for a period of ten years trying to get its application approved on the basis of zoning which is, in round numbers, one-acre zoning.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

Now, at this late stage, ten years after the original, basically legitimate application was made, the municipality, in effect, doubles the requirement and cuts by at least half the number of houses that the plaintiff might put on its tract.

That simply is not fair within the meaning of the cited cases. It's unfair to the plaintiff, unfair to the public. It's not an appropriate way to relate to a judicial proceeding.

So I will direct that the plaintiff's renewed application must be considered expeditiously, and that there must be a final decision rendered with respect to it by the Planning Board.

The decision must be rendered no later than June 26, 1987. And the decision must be based on the roughly one-acre zoning which was in effect prior to the October 7, 1986 change.

And it must be rendered without any reference to a steep slope ordinance.

There is no error in the trial judge's reasoning. The same judge has been managing this case since 1986. We should defer to his sound discretion in this matter.

## III

Aside from the correctness of the decision below, there is a more profound policy reason for not adopting the majority's position. Millions of Americans are being priced out of buying or renting the kind of housing they otherwise could afford if not for excessive government regulations. (That despite all of the regulations we build homes with plywood roofs that char and rot when exposed to the warmth of the sun is paradoxical.) See Marian Zenn Goldberg, *Fire–Resistant Treated Plywood: The Roof is Caving In,* Trial, July 1990, at 10.

The Report to President Bush and Secretary Kemp by the Advisory Commission on Regulatory Barriers to Affordable Housing, chaired by former Governor Thomas H. Kean, described the basic problem: "[B]ecause of excessive and unnecessary government regulation, housing costs are too often higher than they should and could be." Advisory Commission on Regulatory Barriers to Affordable Housing, *"Not in my Back Yard": Removing Barriers to Affordable Housing* 4 (1991) (hereinafter Report).[1] This case presents one aspect of that problem.

---

[1] The use of the expression "affordable housing" in this context and in my opinion is not meant to convey the impression that this case concerns "low-cost" housing in the *Mount Laurel* sense, but only to address the effect of regulatory processes on the general range of housing costs.

> Slow and overly burdensome permitting is another regulatory obstacle. The original rationale for establishing permitting and approval processes is unassailable: to ensure that construction meets established standards related to health, safety, and other important public concerns. But, in many jurisdictions, the process involves multiple, time-consuming steps that add unnecessarily to housing costs. Delays of 2 to 3 years are not uncommon. [Report, *supra*, at 5.]

A delay of two to three years might be tolerable, but after nineteen years we ought to say "enough." Even were we to begin the regulatory clock in 1976, we can see that the average sales price of a home in the Northeast rose from $60,000 to peak at $180,000. Report, *supra*, at 1–4 (Appendix A).

Three years have passed since the Law Division directed the Planning Board to review plaintiff's application. It has taken three years to decide one question—whether the Law Division correctly assessed this land-use matter.

> Developers are at a distinct disadvantage in this litigation process, since it is common knowledge that it is far easier to obstruct and delay through the litigation, than it is to obtain final judicial decision. Aside from the direct costs of litigation, developers are burdened with often greater indirect costs such as the carrying cost of the land during the period of delay.
>
> [Peter A. Buchsbaum, Thomas F. Collins, Jr., Gary T. Hall, Guilet D. Hirsch, and Susan R. Kaplan, *On the Need for Reform of the Land Use and Environmental Litigation System*, 13 Land Use Law Section Newsletter (N.J.St.B.A.), Jan. 1991, at 1, 9.]

We have but a limited role to play in the land-development process, but it is an important one. Without effective judicial review of development application proceedings, the rule of law will be meaningless in this field. I realize that there are many other pressing demands on judicial resources. Criminal and family dockets must of course come first. But the guiding principle of our analysis in this field ought be directed at a powerful policy goal—that of contributing to the removal of judicial barriers to affordable housing.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, and STEIN—5.

*For reversal and reinstatement*—Justices O'HERN and GARIBALDI—2.

# APPENDIX A

**Exhibit 1–2**
**Average Sales Price of Constant Quality Houses, by Region**

Source: *Current Construction Reports*, U.S. Bureau of the Census, Washington, D.C.