805 A.2d 456 (2002)
354 N.J. Super. 171
EASTAMPTON CENTER, LLC, Plaintiff-Respondent,
v.
The PLANNING BOARD OF the TOWNSHIP OF EASTAMPTON and Mary Jane Jones, Township Clerk and Township Administrative Officer of the Township of Eastampton, Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 2002.
Decided August 20, 2002.
*457 Kenneth S. Domzalski, Burlington, argued the cause for appellant Planning Board of the Township of Eastampton (Mr. Domzalski, on the joint brief filed by appellants).
John E. Harrington, Medford, argued the cause for appellant Mary Jane Jones (Mr. Harrington, on the joint brief filed by appellants).
Thomas F. Carroll, III, Princeton, argued the cause for respondent (Hill Wallack, attorneys; Mr. Carroll and Steven W. Griegel, on the brief).
Before Judges CUFF, WECKER and WINKELSTEIN.
The opinion of the court was delivered by WECKER, J.A.D.
This appeal arises out of a conflict between two contemporaneous processes: a municipal land use board's adoption of a new Master Plan for the municipality and a developer's attempt to gain long-term protection from zoning changes by obtaining approval of a General Development Plan. That confluence of circumstances raises several issues, including the standard for determining that a development application is complete; the application of statutory default approval; and the time of decision rule.
Defendants Township of Eastampton Planning Board ("the Board") and Township Clerk Mary Jane Jones ("Jones") appeal from the entry of summary judgment *458 in favor of plaintiff Eastampton Center, LLC ("ECLLC"). That judgment reversed the Board's determination that ECLLC's General Development Plan ("GDP") application was incomplete and awarded ECLLC automatic preliminary approval by default. Defendants also appeal from an order denying reconsideration.
ECLLC proposed to build 577 residential units on its property (a 25% increase in Eastampton's total housing stock), including nearly 300 single-family detached homes, and to make an additional twenty-one acres (210,000 square feet) available for commercial development. According to Eastampton Township Planner Peter Karabashian, ECLLC's plan was one of the largest projects ever proposed in Eastampton.
On appeal, defendants argue that ECLLC's complaint was untimely filed, that the Board's determination of incompleteness was neither arbitrary nor capricious, and that the Law Division judge erred in granting default approval. In addition to responding to defendants' arguments on the merits, ECLLC contends that defendants' appeal is untimely.
We have carefully reviewed the record, the briefs, and the arguments of counsel, and we are convinced that defendants' appeal was timely filed; that both default certification of the GDP application's completeness and default approval of that application were erroneously granted; and that the Board's determination that plaintiff's application was incomplete was supported by substantial credible evidence and should have been affirmed. We therefore reverse.

I.
The material facts are not in dispute, including the procedural history, with the exception of the date on which the Board received the last item constituting part of plaintiff's application.

A.
Since 1986, ECLLC has owned a 210-acre parcel of land located in Eastampton Township. When ECLLC purchased the parcel in 1986, it was zoned solely for agricultural use. The parcel was rezoned several times thereafter, and by 1997 it was in the Town Center Zone, where both residential and commercial uses were permitted. Notwithstanding these zoning changes, the parcel continued to be used as a farm.
In August and October 1997, a substantial number of Eastampton's approximately 6,000 residents petitioned the Eastampton Township Council (the "Council") to take action to preserve specific parcels of undeveloped land in Eastampton (but not the parcel owned by ECLLC) as open space. In response to this petition, and after reviewing state and county open space programs, in March 1998 the Council circulated a survey to all registered voters to determine support for a three-cent open space municipal tax to fund open space preservation initiatives. Approximately 84% of the responding citizens approved the proposed tax.
Based upon this response, the Council began working on zoning ordinance amendments for Eastampton, including the district in which ECLLC's property was located. However, after determining that Eastampton's existing Master Plan did not address open space and controlled growth, the Council decided to further amend the Master Plan to provide for open space before amending various portions of the zoning ordinance. The Master Plan approved in December 1998 was formally adopted by Resolution 1999-03 in January *459 1999. The zoning ordinance was amended in March 1999.

B.
In 1975, as part of the MLUL, the Legislature authorized municipalities to zone for planned development districts. N.J.S.A. 40:55D-65c, enacted by L.1975, c. 291, § 52. In 1987, the Legislature adopted the concept of a general development plan, which is defined as "a comprehensive plan for the development of a planned development," N.J.S.A. 40:55D-4, and authorized municipalities to allow "developers of projects greater than 100 acres in size to create a General Development Plan (GDP) with regard to their projects and to submit this GDP for approval to the planning board." Cox, New Jersey Zoning and Land Use Administration § 16-2.2 at 353 (2002) (hereinafter "Cox") (referring to N.J.S.A. 40:55D-45.1 and -45.2). See generally N.J.S.A. 40:55D-45.1 to -45.8, enacted by L.1987, c. 129; see also David J. Frizell, 36 New Jersey Practice, Land Use Law §§ 15.1 to 15.10 (2d ed.1999).
Governor Kean conditionally vetoed the original 1987 bill that provided for general development plans, S-2966/A-3685, on the ground that it was inconsistent with the MLUL by appearing to require that a municipality adopt every "complete" general development plan "regardless of what the planning board thinks about the merits of the proposed planned development and its relationship to the municipal master plan." The Governor's conditional veto message, proposing amendments to the bill, expressed the intention that "approval (for vested rights for general development plans) would be granted by the planning board consistent with the master plan and the zoning ordinance." (Emphasis added). Office of the Governor, News Release, April 27, 1987. As the Governor indicated in his recommendations, "[a] general development plan would precede preliminary subdivision plat or preliminary site plan approval and, if approved by the municipality, would have vested rights against subsequent changes in municipal ordinances." (Emphasis added).

C.
Because this appeal arises out of the Board's determination that the application was incomplete, and plaintiff's contention that the municipality had not adopted a checklist by ordinance, see N.J.S.A. 40:55D-10.3, we must detail Eastchester's checklist requirements. N.J.S.A. 40:55D-45.2 sets forth the many items that a municipality may require as part of a general development plan:
a. A general land use plan at a scale specified by ordinance indicating the tract area and general locations of the land uses to be included in the planned development. The total number of dwelling units and amount of nonresidential floor area to be provided and proposed land area to be devoted to residential and nonresidential use shall be set forth. In addition, the proposed types of nonresidential uses to be included in the planned development shall be set forth, and the land area to be occupied by each proposed use shall be estimated. The density and intensity of use of the entire planned development shall be set forth, and a residential density and a nonresidential floor area ratio shall be provided;
b. A circulation plan showing the general location and types of transportation facilities, including facilities for pedestrian access, within the planned development and any proposed improvements to the existing transportation system outside the planned development;

*460 c. An open space plan showing the proposed land area and general location of parks and any other land area to be set aside for conservation and recreational purposes and a general description of improvements proposed to be made thereon, including a plan for the operation and maintenance of parks and recreational lands;
d. A utility plan indicating the need for and showing the proposed location of sewage and water lines, any drainage facilities necessitated by the physical characteristics of the site, proposed methods for handling solid waste disposal, and a plan for the operation and maintenance of proposed utilities;
e. A storm water management plan setting forth the proposed method of controlling and managing storm water on the site;
f. An environmental inventory including a general description of the vegetation, soils, topography, geology, surface hydrology, climate and cultural resources of the site, existing man-made structures or features and the probable impact of the development on the environmental attributes of the site;
g. A community facility plan indicating the scope and type of supporting community facilities which may include, but not be limited to, educational or cultural facilities, historic sites, libraries, hospitals, firehouses, and police stations;
h. A housing plan outlining the number of housing units to be provided and the extent to which any housing obligation assigned to the municipality pursuant to P.L.1985, c. 222 (C. 52:27D-301 et al.) will be fulfilled by the development;
i. A local service plan indicating those public services which the applicant proposes to provide and which may include, but not be limited to, water, sewer, cable and solid waste disposal;
j. A fiscal report describing the anticipated demand on municipal services to be generated by the planned development and any other financial impacts to be faced by municipalities or school districts as a result of the completion of the planned development. The fiscal report shall also include a detailed projection of property tax revenues which will accrue to the county, municipality and school district according to the timing schedule provided under subsection k. of this section, and following the completion of the planned development in its entirety;
k. A proposed timing schedule in the case of a planned development whose construction is contemplated over a period of years, including any terms or conditions which are intended to protect the interests of the public and of the residents who occupy any section of the planned development prior to the completion of the development in its entirety; and
l. A municipal development agreement, which shall mean a written agreement between a municipality and a developer relating to the planned development.
According to Eastampton Ordinance § 103-19(N)(1)(a), an applicant for Town Center development plan approval is required to submit a GDP which "generally" follows the "submission requirements contained in the ... enabling statutes of the Municipal Land Use Law (MLUL)." In the Fall of 1998, when plaintiff submitted its application, the Town Center Zone in which ECLLC's property was located permitted single and multiple-family residential dwellings, business and commercial uses, supermarkets, government buildings, schools, places of worship, open space and recreational use. Ordinance § 103-19 set forth the then required elements of a General Development Plan for the Town Center Zone:
*461 M. Phasing. The village center may be developed in phases or sections based on a phasing plan to be submitted as part of the application. If any section includes modifications to the general development plan, density and/or circulation, the Planning Board may require submission of a revised general development plan (GDP) demonstrating that the overall density, land use, open space and circulation is consistent with the previously approved general development plan.
N. General development plan, preliminary and final planned village development (PVD) plan submission requirements and procedures.
(1) General development plan.
(a) The applicant for village center approval shall first submit a general development plan (GDP) for approval by the Planning Board. The GDP shall follow generally the procedures and submission requirements contained in the New Jersey enabling statutes of the Municipal Land Use Law (MLUL), and in the township ordinances. The GDP shall contain the following information:
[1] Proposed density and intensity of uses.
[2] Boundary survey and description of the tract.
[3] Proposed land use plan including open space.
[4] Proposed circulation plan.
[5] Proposed open space plan, including recreation and community facilities and pedestrian walkways, and rescue squad facilities.
[6] Utility plan, including all public services.
[7] Drainage plan; master stormwater management plan.
Environmental inventory (soils, vegetation, topography, geology, surface hydrology, climate, culture/historical resources, wildlife).
[9] Housing plan.
[10] Fiscal impact report.
[11] General phasing plan.
(b) The GDP shall be reviewed and acted upon as provided in the MLUL and in the township ordinances and as described herein and shall include reports from the township's staff, including a Traffic Engineer, Municipal Engineer, planning consultant, Fire Marshal and police.

C.
At or about the time of the survey, Eastampton's Land Use Coordinator, Tracey Mackner, met with plaintiff's engineer, Brian Mitchell, who had been hired to prepare plans for the development of ECLLC's property. According to Mackner, she met with Mitchell on two other occasions in August 1998 to discuss the materials required to support a GDP application for development in the Town Center Zone. Mackner recalled that she provided Mitchell with a copy of Eastampton's Town Center Ordinance, § 103-19, and advised that the ordinance included a checklist of all required submissions. According to Karabashian, the list set forth in the ordinance incorporated by reference the MLUL's more detailed description of each item listed in the ordinance, and constituted Eastampton's GDP checklist. Failure to meet the checklist requirements is a ground for avoiding default certification of completeness, but only if the checklist has been adopted by ordinance. N.J.S.A. 40:55D-10.3.
On September 2, 1998, ECLLC submitted an application for GDP approval to the Board, which included: (1) the township's form application, which identified the tract *462 and described the project in abbreviated fashion, (2) three sheets, one depicting the general lot layout, one an overall utility plan, and one a stormwater management plan; (3) a preliminary stormwater management report; and (4) two checks totalling $750.
Mackner forwarded ECLLC's application to the Board's engineers, E.W. Engelbrecht and Joseph S. Augustyn, as well as to Karabashian, for review and comments. By letter dated October 8, 1998, the engineers advised Mackner that after consulting local ordinance § 103-19(N)(1)(a) and N.J.S.A. 40:55D-45.2, they found ECLLC's application incomplete because it did not include: (1) a land use and open space plan; (2) a circulation plan; (3) recreation and walkway information; (4) an environmental inventory;[1] (5) a housing plan; (6) a fiscal impact report; and (7) a general phasing plan. The omitted items correspond to those items listed at N.J.S.A. 40:55D-45.2a, b, c, f, h, j, and k, respectively. Engelbrecht and Augustyn also noted that ECLLC's application might be deficient "with providing other forms and data regarding checklists, escrows, etc., required by Eastampton Township".
By memo dated October 13, 1998, Karabashian advised the Board that contrary to § 103-19(N)(1)(a), ECLLC had failed to identify or provide: (1) the proposed intensity of development in the commercial areas; (2) the required survey and description; (3) the proposed non-residential floor area; (4) facilities for pedestrian access and proposed improvements outside the Planned Development boundaries; (5) a general description of the improvements and a plan for operation and maintenance of parks and recreation lands; (6) the proposed method of handling solid waste and a utilities operation and maintenance plan; (7) an environmental impact statement; (8) a housing plan; (9) a fiscal impact report; and (10) a general phasing plan for the proposed development. Those items correspond to items set forth at N.J.S.A. 40:55D-45.2 a, b, c, d, f, h, j, and k. Karabashian recommended that the Board declare the application incomplete at its next meeting.
In accordance with the recommendations of its professionals, the Board deemed ECLLC's application incomplete at its October 14, 1998 meeting. ECLLC thereafter submitted a "revised" environmental assessment report to the Board on October 20, 1998. Additionally, on October 29, 1998, ECLLC hand delivered to the Board a site plan and related drawings, a fiscal impact report, and deeds setting forth property descriptions. According to ECLLC, its October 29, 1998 submissions also included a revised, two-page GDP. The Board, however, contends that the last item, the revised GDP, was not received until November 2, 1998.[2] *463 Then, in a November 30, 1998 letter, ECLLC "amend[ed] its GDP application" to reflect its willingness to sell some of its proposed garden apartment units to low and moderate income families in order to satisfy what it perceived as Eastampton's unmet low and moderate income housing obligation, but claimed that the plan itself remained unchanged.
After reviewing the newly submitted documents, Engelbrecht and Augustyn advised Mackner by letter dated December 14, 1998, that
[a]lthough several additional required items have been made part of this application, the submission remains incomplete regarding the GDP Open Space/Recreation Plan and Utility Plan. Specifically, the application lacks the Open Space Plan text and schedule describing these facilities in accordance with the MLUL. The Utility Plan is incomplete regarding solid waste handling and recycling. As stated in our October 8, 1998 review, the application may also be incomplete with respect to providing escrows and a development checklist, as required by Eastampton Township. It should also be noted that although a sheet entitled "Stormwater Management Plan" was submitted, it appears inconsistent with the Eastampton Stormwater Management Ordinance.
By memo dated December 14, 1998, Karabashian advised the Board that ECLLC still had not provided sufficient information with respect to two previously-identified deficiencies in its application. Karabashian's report, which was forwarded to plaintiff's attorney along with the Board's written determination of incompleteness, detailed the missing items pursuant to the zoning ordinance, § 103.19N(1)(a)(5) and (6):
[5] Open Space PlanA general description of the improvements and a plan for operation and maintenance of parks and recreation lands are not provided. Although the plan shows a table indicating the number and type of recreational facilities proposed, there is no general description of the improvements such as the size of each facility, whether play equipment is proposed, or if there are any specialized areas such as lighted facilities.
In addition, there is no plan for operation and maintenance of parks and recreation lands. Plan note # 2 on sheet C1 of the General Development Plan states that "open space/recreational facilities are proposed to be dedicated to the municipality. Operation and maintenance would be administered by Eastampton Township." Given the number, type and size of the open space and recreational facilities proposed for a development in excess of 200 acres, it is not sufficient to simply state that the Township will administer these facilities.
[6] Utility PlanThe proposed method of handling solid waste and a utilities operation and maintenance plan are not provided. Plan note # 1 on sheet C1 of the General Development Plan states that "all single family detached and single family attached residences to have curb-side trash pick-up." Without assurances from the Township that this is satisfactory, it is not sufficient to simply note that the Township will be responsible for trash pick-up for what could be an additional 433 residential units. In addition, there is no mention as to how solid waste removal will be accommodated for the 144 proposed multi-family units. The plan also does not indicate how recycling for the proposed 577 total housing units will be accommodated.
Plan sheet C3 entitled "Overall Utility Plan" shows the location of proposed *464 utilities but does not provide an operation and maintenance plan, as required.
Relying upon the advice of its professionals, the Board again deemed ECLLC's application incomplete at its meeting on December 16, 1998. By letter dated December 16, 1998, the Board's attorney advised ECLLC of the Board's determination.[3]
Counsel for ECLLC wrote to the Board on December 21, 1998, contending that because Eastampton had no checklist for GDPs, the Board was without authority to declare ECLLC's application incomplete. By letter of January 13, 1999, the Board rejected ECLLC's position. ECLLC responded by letter dated January 19, 1999, requesting an immediate hearing on the completeness of its application. The Board did not respond.
On February 3, 1999 counsel for ECLLC mailed a notice of default preliminary approval to all those statutorily-entitled to notice, and on February 4 published a notice of default approval in the Burlington County Times. On February 5, 1999, counsel for ECLLC provided defendant Jones with the statutorily-required affidavit certifying that the notices were mailed and on February 11 wrote to Jones requesting the issuance of a certificate of default preliminary approval. At the direction of the Board's attorney, Jones did not comply with that request. On March 2, 1999, plaintiff filed a complaint in lieu of prerogative writs challenging the actions of the Board and Jones.
Meanwhile, on December 23, 1998, the Board amended Eastampton's Master Plan to provide for additional open space and controlled development in certain sections of Eastampton, including ECLLC's property. In order to implement the revised Master Plan, on March 8, 1999, the Board enacted several zoning ordinance amendments. The Town Center was rezoned "Business Park/Agriculture Commercial Recreation." In the new zoning ordinance, all residential use was prohibited, commercial uses were expanded, and a recreation component was added to allow for driving ranges and golf courses. The amended zoning ordinance became effective twenty days later on March 28, 1999. See N.J.S.A. 40:69A-181(b).
In ECLLC's prerogative writ action, the parties cross-moved for summary judgment. The Law Division judge granted summary judgment to ECLLC on July 19, 2000, ruling that the Board had wrongly declared ECLLC's application incomplete on December 16, 1998, that the application was deemed complete, and that ECLLC was entitled to default preliminary approval. Defendants moved for reconsideration, and ECLLC cross-moved for the entry of an order compelling the issuance of a certificate of default approval and establishing the vesting period of its approval. Both motions were heard on September 22, 2000 and denied by order dated October 19, 2000. A certificate of default approval was thereafter issued to ECLLC as ordered, and the Board fixed the period of protection at ten years from plaintiff's acquisition of final approval of the first section of the planned development.
At some point after the foregoing proceedings, the Board passed additional *465 amendments to Eastampton's Master Plan in furtherance of its Open Space/Farmland Preservation Program. Pursuant to these amendments, ECLLC's property, as well as five other individually owned parcels, were designated for acquisition by Eastampton for use as open space.

II.
Before we reach the merits of this appeal, we must address plaintiff's contention that defendants' notice of appeal was not timely filed, and we therefore have no jurisdiction over this appeal. Defendants maintain that "the time limits prescribed by the Rules of Court were complied with under the facts and circumstances of this case." We reject ECLLC's argument that because the Board's notice of motion for reconsideration did not comply with R. 4:49-2 or R. 1:6-2(a), and because Jones failed to file a separate notice of motion for reconsideration, the forty-five day period for each defendant to appeal was not tolled by the motion, and the appeal should be dismissed for lack of jurisdiction.
An appeal from a final order must be filed within forty-five days of entry of that order. R. 2:4-1(a). That period may be extended for no more than thirty days upon a showing of good cause and the absence of prejudice, so long as the notice of appeal was actually filed within the extended time. R. 2:4-4(a). Nevertheless, the time for taking an appeal is tolled "by the timely filing and service of a motion... for reconsideration ... pursuant to R. 4:49-2." R. 2:4-3(e).[4] Although hardly a model of good motion practice in the Law Division, we conclude that defendant's motion for reconsideration was timely served (and filed) for purposes of tolling the time for appeal.
Once again, the details are essential. This is the relevant chronology. An order granting summary judgment to ECLLC was filed on July 19, 2000. Plaintiff's counsel apparently did not receive a copy of the filed order until July 28, and defense counsel received it on August 1. On August 8, defense counsel delivered a notice of motion for reconsideration of the July 19 order directly to the motion judge's chambers, along with a cover letter, but no formal brief or certification. Counsel's August 8 letter was faxed and mailed to opposing counsel the same day; the notice of motion was stamped "filed" on August 10.[5] The notice of motion incorporated Jones's request for the same relief, but did not set a return date or include a proposed form of order or supporting papers.
By letter of September 13 from John Harrington, Esq., counsel for Jones (and the Township), and again by letter of September 20 from Kenneth S. Domzalski, Esq., counsel for the Board, the motion judge was requested to grant a thirty-day adjournment of the return date of defendants' motion for reconsideration, in order to allow time for purportedly ongoing discussions or for submission of appropriate papers in support of the motion. Domzalski promised to file supporting papers within two weeks, and requested a telephone conference respecting his application for an adjournment. No telephone *466 conference took place, and counsel renewed his application for an adjournment at argument on September 22. The adjournment was denied. During that argument on September 22, 2000, the judge stated that she had not received counsel's September 20 letter by fax and therefore had not read it. The judge denied the Board's motion for reconsideration, saying "when I reviewed this matter, the entire record consisted of the notice of motion, plus Domzalski's letter. None of that complies with the rule which [is] 4:49-2. And, accordingly, the motion is denied."
An order denying reconsideration was signed and filed on October 19, 2000. Defendants' notice of appeal from the July 19 and October 19 orders was filed on October 31, 2000.
Rule 4:49-2 requires that a motion for reconsideration
shall be served not later than 20 days after service of the judgment or order upon all parties by the party obtaining it. The motion shall state with specificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred.
A timely filed motion for reconsideration tolls the time for filing an appeal. R. 2:4-3(a). However, an untimely motion to reconsider does not. In re Hill, 241 N.J.Super. 367, 371, 575 A.2d 42 (App.Div.1990); R. 2:4-1(a). "Neither the parties nor the court may ... enlarge the time specified by R. 4:49-2." R. 1:3-4(c). Plaintiff does not contend that defendants' notice of motion for reconsideration was not timely served. Defense counsel received the summary judgment order on August 1; the August 8 (or 10) notice therefore was timely, although non-conforming. Plaintiff contends, as the judge apparently reasoned, that because defendant's motion did not provide all of the support required by R. 4:49-2, the motion was not timely filed. We disagree.
Every motion made to a court must "state the time and place when it is to be presented to the court, the grounds upon which it is made and the nature of the relief sought and shall be accompanied by a proposed form of order." R. 1:6-2(a). Rule 1:1-2 provides that the rules of court "shall be construed to secure a just determination" and permits relaxation of any rule "if adherence to it would result in an injustice" so long as such relaxation is not expressly prohibited. We do not read R. 1:3-4(c) to prohibit an extension of time to perfect a non-conforming motion in these rather unique circumstances.
We do not intend to make light of the obligation of counsel, when seeking reconsideration of a court order or judgment, to include all of the required supporting materials along with the notice of motion. Notwithstanding the inadequacy of defendants' motion papers, and without condoning defendants' practice, our concern is that a matter of substantial public interest should be resolved on the merits and not by a procedural default. Under all of the circumstances presented by this record, including the magnitude of the dispute in issue, the public interest in a just resolution, the burden upon defense counsel of responding within a short period to a multiplicity of lawsuits filed by plaintiff with respect to various aspects of plaintiff's development proposal,[6] we find that the motion judge abused her discretion *467 when she denied defendants a brief adjournment to complete their submission.
More to the point with respect to the timeliness of the motion, plaintiff was unquestionably served with a copy of defendants' notice of motion for reconsideration within twenty days of defendants' receipt of the July 19 order. Plaintiff was thus aware that defendants were challenging the decision, and has demonstrated no prejudice that would justify holding service of the notice untimely for purposes of tolling defendants' time to appeal.

III.
We also reject defendants' argument that ECLLC's complaint in lieu of prerogative writs should have been dismissed because, contrary to R. 4:69-6, it was filed more than forty-five days after the Board's December 16, 1998 determination of incompleteness. Defendants rely upon Rieder v. State Department of Transp., 221 N.J.Super. 547, 535 A.2d 512 (App.Div.1987), and Lake Shore Estates, Inc. v. Denville Tp. Planning Bd., 255 N.J.Super. 580, 605 A.2d 1106 (App.Div. 1991), aff'd o.b., 127 N.J. 394, 605 A.2d 1073 (1992), for the proposition that a determination of incompleteness is an appealable decision. Whether or not such a determination is appealable, neither case stands for the proposition that a determination of incompleteness is a final decision that triggers the forty-five day period for filing a notice of appeal.
We reject defendants' argument as without merit. See R. 2:11-3(e)(1)(E).

IV.

A.
As a preliminary matter with respect to the timeliness of the Board's December 16 determination of incompleteness, plaintiff did not meet its burden of establishing that there was no material dispute of fact. On its motion for summary judgment seeking a default certification of completeness of its GDP application, plaintiff and the court were faced with Mackner's certification, as Eastampton's land use coordinator, that she received the last item in plaintiff's application on November 2, and not October 29 as plaintiff claimed. Mackner's certification created a material issue of fact that the motion judge ignored in ordering certification of completeness for failure to make the determination within forty-five days of submission. In support of their motion for reconsideration, defendants expressly argued that the judge had failed to consider the Mackner certification or the good-faith/bad-faith aspect of what she found to be an untimely determination of incompleteness. Nevertheless, the judge denied defendants' motion for reconsideration without addressing defendants' arguments.

B.
The Township did not adopt a separate "checklist" for GDP applications, as it apparently had for site plan and sub-division applications. However, we agree with defendants' contention that by listing the required elements of a GDP, and explicitly referencing "the submission requirements contained in the ... MLUL," § 103-19N (1)(a), the ordinance effectively sets forth the requirements of a GDP application.
N.J.S.A. 40:55D-10.3 provides, in pertinent part:
An application for development shall be complete for purposes of commencing *468 the applicable time period for action by a municipal agency, when so certified by the municipal agency or its authorized committee or designee. In the event that the agency, committee or designee does not certify the application to be complete within 45 days of the date of its submission, the application shall be deemed complete upon the expiration of the 45-day period for purposes of commencing the applicable time period, unless: a. the application lacks information indicated on a checklist adopted by ordinance and provided to the applicant; and b. the municipal agency or its authorized committee or designee has notified the applicant, in writing, of the deficiencies in the application within 45 days of submission of the application.

[Emphasis added.]
The term "checklist" is not defined in the MLUL. Compare N.J.S.A. 40:55D-3 to -7, defining seventy-six other terms used in that Law. Thus the "checklist" referred to in N.J.S.A. 55D-10.3 must be deemed to have its ordinary meaning. A "checklist" is "a list ... intended for ready checking and reference." Webster's Third New International Dictionary of the English Language (1993). The itemized list set forth in N.J.S.A. 40:55D-45.2, meets that definition on its face. Although the statute is permissive rather than mandatory in prescribing the required elements of a GDP plan,[7] Eastampton has in fact incorporated virtually all of the permitted elements as its requirements for a GDP application. The following chart indicates the parallel provisions of the Eastampton ordinance list and the MLUL list:

Ordinance § 103-19N(1)(a) N.J.S.A. 40:55D-45.2
 [1]............... a
 [2]
 [3]............... a
 [4]............... b
 [5]............... c and g
 [6]............... d and i
 [7]............... e
 [8]............... f
 [9]............... h
 [10]...............j
 [11]...............k

Moreover, the ordinance expressly provides at § 103-19(b):
(b) The GDP shall be reviewed and acted upon as provided in the MLUL and in the township ordinances and as described herein and shall include reports from the township's staff, including a Traffic Engineer, Municipal Engineer, planning consultant, Fire Marshal and police.
Karabashian's criticism of the omissions from plaintiff's October 28 submission goes to the heart of the stated goals of the revised Eastampton Master Plan: to preserve open space, maximize the commercial tax base, and limit residential growth with its impact on the need for municipal services. Karabashian's December 14, 1998 report prepared for the December 16, 1998 Planning Board meeting identified two ordinance checklist items that plaintiff *469 failed to supply; they are codified at § 103-19 N(1)(a)[5] & [6]. Subsection [5] requires an "open space plan," as more fully described by the MLUL, N.J.S.A. 40:55D-45.2 c and g. Subsection 6 requires a "utility plan," as more fully described by the MLUL, N.J.S.A. 40:55D-45.2d and i.
It has been said that the Legislature in N.J.S.A. 40:55D-10.3 intended to preclude a municipal agency from declaring an application incomplete by requesting "additional information not specified in the ordinance." Purwin v. Bernards Tp. Planning Board, 221 N.J.Super. 243, 248, 534 A.2d 96 (Law Div.1987). Plaintiff's reliance on Purwin is misplaced. In that case, the allegedly omitted items were contained in board resolutions, and had not been adopted by ordinance. See City of S. Amboy v. Gassaway, 101 N.J. 86, 94, 501 A.2d 120 (1985). In Eastampton, to the contrary, the required submissions were set forth in a duly adopted ordinance, although the details were incorporated by reference from the statute. The intention of the statuteto avoid ad hoc board requirements of which an applicant had no fair, advance noticeis fully met by our ruling.
Whether the Board's December 16 declaration of incompleteness is viewed as having been issued within forty-five days of a November 2 application, or beyond forty-five days after an October 29 application (as the Law Division judge found), it was error to "deem [ ] the application complete... for purposes of commencing the [95 day] time period" for acting on the application. N.J.S.A. 40:55D-10.3. That is because the application was in fact incomplete, as the Board's professional engineer and planner found, lacking as it did "information indicated on [the statutory] checklist adopted by ordinance and provided to the applicant," which deficiencies were set forth in writing to plaintiff by the Board's designees well within forty-five days of October 29, the earliest arguable date of a complete plan submission.
In considering whether the October 28 (or the November 2 application) was complete, we deem it essential to take into account the magnitude of the project proposed, and the enormous difference between GDP approval, which potentially protects a developer from zoning changes for twenty years, N.J.S.A. 40:55D-45.1b, and a site plan or subdivision application, which protects the applicant for only two to five years. See, e.g., N.J.S.A. 40:55D-46.1c, -49.3c & d. Our research reveals virtually no cases addressing the standard upon which to measure the completeness of such an application, nor have we found the subject addressed in the literature or legal commentary. However, we are convinced that given the impact of GDP approval, and the relatively short period the same 95 days allowed for action on an application for a major sub-division or a site plan of more than ten acres or ten units,[8] the Board was entitled to take a strict view of the required elements of plaintiff's GDP application. Under these circumstances, the Board's determination is entitled to the presumption of validity normally accorded such administrative action. See, e.g., Kramer v. Bd. of Adjustment, Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965) (recognizing a municipal board's "peculiar knowledge of local conditions").

V.
Even if the Board erred in finding plaintiff's GDP application incomplete, and even if the application was properly declared complete because the Board's action on December 16 was out of time, which we do *470 not find, the Law Division judge nevertheless erred in concluding that the application was entitled to automatic, substantive approval because the Board failed to consider and act on the application within 95 days of its submission.
It is a long held principle of our law that automatic approval statutes are to be "applied with caution." King v. New Jersey Racing Comm'n, 103 N.J. 412, 422, 511 A.2d 615 (1986); Star Enterprise v. Wilder, 268 N.J.Super. 371, 374, 633 A.2d 1001 (App.Div.1993). On the other hand, statutes prescribing "strict timetables and a careful methodology [do] not imply waiver or relaxation" of their terms. Manalapan Holding Co. v. Planning Bd. of the Tp. of Hamilton, 92 N.J. 466, 482, 457 A.2d 441 (1983), rev'g 184 N.J.Super. 99, 445 A.2d 410 (App.Div.1982).
Despite the seemingly mandatory language of N.J.S.A. 40:55D-10.3, there is ample precedent for a court to deny automatic approval to a development application, especially where the municipal board's failure to act within the statutory deadline is technical or inadvertent, and where there is no evidence of intentional delay or inattention to the application. See Manalapan Holding Co., 92 N.J. at 476, 457 A.2d 441; Star Enter., 268 N.J.Super. at 375-77, 633 A.2d 1001; D'Anna v. Planning Bd. of Washington Tp., 256 N.J.Super. 78, 82-83, 606 A.2d 417 (App.Div.), certif. denied, 130 N.J. 18, 611 A.2d 656 (1992); Allied Realty v. Borough of Upper Saddle River, 221 N.J.Super. 407, 418-20, 534 A.2d 1019 (App.Div.1987), certif. denied, 110 N.J. 304, 540 A.2d 1284 (1988); cf. In re Disapproval of Commercial Ins. Policy Forms of Ins. Co. of No. America, 264 N.J.Super. 228, 238-39, 624 A.2d 587 (App.Div.1993) (Insurance Department's failure to properly promulgate the challenged rule did not entitle insurance company to "drastic relief" by way of automatic approval of pollution exclusion endorsement).
"[A]pplication of the statutory time constraints must be anchored in the reason for their existence. The evil which the automatic approval provisions were designed to remedy was municipal inaction and inattention." Allied Realty, 221 N.J.Super. at 418, 534 A.2d 1019. The purpose of these time limits is to expedite decision-making on land use applications. Lizak v. Faria, 96 N.J. 482, 492, 476 A.2d 1189 (1984). Accord Star Enter., 268 N.J.Super. at 376, 633 A.2d 1001; D'Anna, 256 N.J.Super. at 82, 606 A.2d 417.
Our courts have been reluctant to uphold an automatic approval absent a clear showing of purposeful delay. For example, the failure to timely act on an application has been excused where a board was operating under an understandable misconception of law, Manalapan Holding Co., 92 N.J. at 480, 457 A.2d 441, and Allied Realty, 221 N.J.Super. at 418-19, 534 A.2d 1019; where a decision was defective because of an inadvertent and technical violation of the law, such as holding a meeting in violation of the Open Public Meetings Act, Precision Indus. Design Co. v. Beckwith, 185 N.J.Super. 9, 18, 447 A.2d 186 (App.Div.), certif. denied, 91 N.J. 545, 453 A.2d 863 (1982); where inaction was the product of inadvertent mistake, such as misplacing the development application, D'Anna, 256 N.J.Super. at 83, 606 A.2d 417; or where the applicant appeared to consent to an extension of time, Star Enter., 268 N.J.Super. at 376-77, 633 A.2d 1001.
In Manalapan Holding Co., the board delayed action on the application because it was under the legally erroneous impression that the applicant first required county planning board approval. Although the Supreme Court held that the local board had misconstrued the law, 92 N.J. at 478, *471 457 A.2d 441, and that this court's finding of a default approval reflected "a careful tracking and literal application of the statute," id. at 480, 457 A.2d 441, nonetheless the case did not justify approval by default. Id. at 480-82, 457 A.2d 441. A court must weigh the relevant factors, including whether the developer acted in good faith or was seeking to take advantage of automatic approval; whether there was evidence of bad faith or obstructionism by the municipality; whether the board's misconception of law was understandable, even if in error; and whether the delay suggested confusion, ignorance or inadvertence. Ibid. The motion judge here expressly declined to address the issue of bad faith in the Board's actions.
In Allied Realty, we rejected automatic approval because we found:
[There was] no hint of bad faith, sharp practice, overreaching or dilatory conduct on the part of the Board. The record is totally devoid of any evidence of prevarication or obstructionism by the municipality. Rather, the course of events created by the parties bespeaks innocent inadvertence and misapprehension. The remedy of automatic approval under the circumstances here would be disproportionately weighed against the public interest.
[Id. at 419-20, 534 A.2d 1019.]
As is clear from the facts and chronology recited above, the Board acted on the professional advice of its planner and engineer in declaring plaintiff's application incomplete. As in Allied Realty, "[o]ur careful reading of the record convinces us that the Board's belief in that respect was entirely reasonable under the circumstances." 221 N.J.Super. at 419, 534 A.2d 1019. No evidence of bad faith appears in this record.
Arguably, when the Board acted on December 16, it was within the required forty-five days of November 2, the date on which Mackner certified to having received the last portion of plaintiff's submission. At worst, if we accept plaintiff's contention that all of its documents were submitted by October 29, the Board's declaration of incompleteness came three days late, on the forty-seventh day. The Law Division judge did not explain why she ignored Mackner's certification in granting summary judgment on the basis of lack of timeliness. But we see no need for resolution of that disputed fact, since even assuming a three-day delay in the Board's determination of incompleteness, we find no basis for the "drastic remedy" of automatic approval of the GDP application's completeness, much less for automatic approval of the application itself. We disapprove the holding of Purwin v. Bernards Tp. Planning Bd., 221 N.J.Super. 243, 534 A.2d 96 (Law Div.1987), to the extent that it granted automatic approval to a minor sub-division application because it found the Planning Board erred in determining the application to be incomplete and therefore obviously did not act on the merits within the required time after the application was deemed complete.
Such a result is unreasonable, because it denies the Board the right in good faith to declare an application incomplete. An incomplete application is not entitled to any consideration on the merits. To sustain default approval of the application on the facts here is to say that a Board that errs in good faith, in determining that an application is incomplete, risks automatic approval of an arguably incomplete application. That was not the intention of the Legislature in enacting the default approval statutes. See Allied Realty, 221 N.J.Super. at 418, 534 A.2d 1019.
The public interest here weighs far more heavily against automatic approval than does the Board's arguably late determination *472 weigh in favor. Indeed, before approving a planned development, a municipal planning board must make certain findings, including "[t]hat the proposed planned development will not have an unreasonably adverse impact upon the area in which it is proposed to be established." N.J.S.A. 40:55D-45d. At most, had plaintiff's GDP application properly been found complete by default, the appropriate remedy would have been to remand the matter to the Board for consideration of the application on its merits. In fact, that was the Board's alternative argument in the Law Division.

VI.
Because Eastampton's zoning ordinance no longer permits the uses contemplated by plaintiff's general development plan application, any remand would raise the issue of the time of decision rule. The Law Division judge did not address the time of decision rule; however, the parties have addressed the issue in their briefs on this appeal.
The Supreme Court has succinctly explained the time of decision rule issue:
A time-of-decision rule problem arises when, after a lower court or administrative agency decision, there is a change in the relevant law that governs the disposition of the issues on appeal. The question in such cases is which law should control the reviewing court's decision: the law in effect when the issues arose and were initially presented for the lower tribunal's determination or the new or amended law that is in effect at the time the appellate court must render its decision.
[Riggs v. Tp. of Long Beach, 101 N.J. 515, 520-21, 503 A.2d 284 (1986).]
It is clear that a municipality may amend its zoning ordinance "during the pendency of a site plan application ... even if the ordinance is amended in direct response to a particular application." Manalapan Realty v. Tp. Comm. of Tp. of Manalapan, 140 N.J. 366, 378-79, 658 A.2d 1230 (1995). While the municipality cannot declare a moratorium on development applications while zoning changes are pending, N.J.S.A. 40:55D-90, under the time-of-decision rule, an appellate court may apply the statute and/or ordinance in effect at the time of its decision, "at least when the legislature intended that its modification be retroactive to pending cases." Kruvant v. Mayor and Council of Cedar Grove Tp., 82 N.J. 435, 440, 414 A.2d 9 (1980).
Application of the time-of-decision rule, a rule of retroactivity, "is not automatic"; a court must take into account equitable considerations, and the outcome depends upon a balance of the equities between the developer on the one hand and the public interest on the other. Pizzo Mantin Group. v. Tp. of Randolph, 137 N.J. 216, 235, 645 A.2d 89 (1994) ("A court must balance the municipality's zoning interest against the developer's degree of reliance on the old statute and its entitlements of right."); Kruvant, 82 N.J. at 445, 414 A.2d 9 ("In view of the extended proceedings, the unquestioned propriety of the trial court's 90-day restriction, and the property owners' satisfaction of the requirements for a variance, the equities warrant and judicial integrity justifies the inapplicability of the time of decision rule."); Tremarco Corp. v. Garzio, 32 N.J. 448, 457, 161 A.2d 241 (1960); Lake Shore Estates, Inc. v. Denville Tp. Planning Bd., 255 N.J.Super. 580, 590, 605 A.2d 1106 (App.Div.1991) (time of decision rule applies), aff'd o.b., 127 N.J. 394, 605 A.2d 1073 (1992); Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J.Super. 203, 220-22, 431 A.2d 163 (App.Div.) (time of decision rule does not apply), certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981); *473 Timber Props., Inc. v. Chester Tp., 205 N.J.Super. 273, 276-79, 500 A.2d 757 (Law Div.1984) (time of decision rule applies); S.T.C. Corp. v. Planning Bd. of Hillsborough Tp., 194 N.J.Super. 333, 336, 476 A.2d 888 (App.Div.1984) (time of decision rule does not apply because "[u]nder general equitable principles, plaintiff should have the benefit of the statutory protection against a change in use requirements").
In Tremarco, 32 N.J. at 457, 161 A.2d 241, the Court explained the equitable issues involved:
There is no easy formula to resolve issues of this kind. The ultimate objective is fairness to both the public and the individual property owner. We think there is no profit in attempting to fix some precise concept of the nature and quantum of reliance which will suffice. Rather a balance must be struck between the interests of the permittee and the right and duty of the municipality through planning and the implementation of that scheme through zoning "to `make, ordain and establish all manner of wholesome and reasonable laws, not repugnant to the Constitution,' as may be deemed to be `for the good and welfare of the commonwealth, and all the subjects of the same.'" Roselle v. Wright, 21 N.J. 400, 408-409, 122 A.2d 506 (1956).
In Lake Shore, we concluded that the developer had "no basis for a justifiable reliance on past municipal approvals .... and was well aware that [the municipality] would adopt a revised ordinance." 255 N.J.Super. at 590, 605 A.2d 1106. We also noted that neither the municipal council nor the planning board had "engaged in the kind of contumacious subversion of an existing order" as supported an exception to the time of decision rule in Kruvant. 255 N.J.Super. at 591, 605 A.2d 1106.
In Urban Farms, we found the equities clearly on the side of the developer who had sought several variances to build a nursing home but found that during the course of an appeal, nursing home use had been eliminated from the zone in which the property was located. Writing for the court, Judge Pressler said:
It is not only the absence of the customary public-interest underpinnings of retroactive application which here concerns us but also what we have already alluded to as the developer's special equities. We have long adhered to the principle in this State that substantial economic reliance by a developer on a building permit issued to him prior to a zoning ordinance amendment will defeat its retroactivity.
[179 N.J.Super. at 221, 431 A.2d 163.]
Judge Pressler described the factors relevant to deciding whether "special equities" warrant an exception to the time of decision rule:
[W]e are of the view that [the decision] requires a weighing of such factors as the nature, extent and degree of the public interest to be served by the ordinance amendment on the one hand and, on the other hand, the nature, extent and degree of the developer's reliance on the state of the ordinance under which he has proceeded, the extent to which his undertaking has been at any point approved or encouraged by official municipal action, and the extent to which, under the circumstances and as objectively determined, he should have been aware that the municipality would be likely to change the ordinance prior to actual commencement of construction. These are the factors constituting the developer's special equities, and if they outweigh the public interest concerns, they should also operate to bar postjudgment retroactivity of a zoning ordinance amendment.
*474 [179 N.J.Super. at 221-22, 431 A.2d 163.]
In Pizzo Mantin, the Supreme Court held that where a proposed sub-division met the requirements of the local zoning and land use ordinances, the local planning board did not have the inherent power to deny the proposal as inconsistent with the MLUL. After a previous remand from the Appellate Division, the zoning ordinance had been amended to increase the minimum lot size applicable to the developer's tract. Under all of the circumstances, the Court declined on further appeal to decide the time-of-decision rule issue:
In this case, resolution of the time-of-decision rule issue should be held in abeyance. Under the circumstances, which call essentially for a reconsideration of a decision previously rendered, it is appropriate to require the planning board to complete that redetermination. In the event the board concludes that the subdivision, either in its present form or with modifications or conditions imposed or approved by the board, would meet the standards of the prior ordinance, the trial court may, thereafter, on the basis of a more complete record, determine the applicability of the new ordinance under the time-of-decision rule. If, on the other hand, plaintiff's application is again rejected, presumably any future application for subdivision will be governed by the ordinances in effect at the time of the resubmission.
[137 N.J. at 216, 645 A.2d 89.]
In contrast to the circumstances in Pizzo Mantin, we view the very detailed record before us as more than sufficient to warrant exercise of our original jurisdiction on the time of decision rule. See R. 2:10-5. Consideration of the equities in the case before us, and a fair balancing thereof, satisfies us that the scales are tipped substantially in favor of the municipality and the public interestan interest in development consistent with the Master Plan and the new zoning ordinance enacted to implement that plan.
As outlined above, Eastampton undertook a public survey respecting land use in the municipality, to which the public responded overwhelmingly in favor of preserving open space, even at the cost of additional property taxes. The Planning Board had its new Master Plan under public consideration for approximately two years before its adoption and held numerous public hearings on the subject during that period. Plaintiff, whose principals are experienced real estate developers, participated in those hearings. Plaintiff owned the property in question for twelve years before submitting this application, and certainly was aware that adoption of a new Master Plan would provoke substantial amendments to the local zoning ordinance.
There was nothing secret or surprising in the zoning change. Plaintiff had ample notice and ample opportunity to present a complete general development plan for approval long before the new zoning ordinance was adopted. The Planning Board responded professionally and in good faith to plaintiff's initial submissions, putting in writing the omissions it found. Moreover, it requires no special expertise to recognize the magnitude of plaintiff's proposal and its impact upon the municipality, including as it does a 25% increase in the local housing stock.[9] That impact is even greater because it is in direct conflict with *475 the expressed goals of the new Master Plan, which provided the rationale and the impetus for the zoning change.
We are impressed by the absence of any special equities or reliance on the part of the developer in this case, and therefore conclude that the public interest justifies application of the time of decision rule. Since plaintiff's proposed uses are not permitted under the present ordinance, there is no purpose to be served by a remand.
Reversed.
NOTES
[1] Although the parties dispute whether an environmental assessment report was included as part of ECLLC's September 2, 1998 submissions, the inclusion or exclusion of a report on that date is not material.
[2] In opposition to plaintiff's motion for summary judgment and in support of its own cross motion for summary judgment, the Board submitted Mackner's certification. Mackner certified to her usual procedure for handwriting the dates on which she received documents related to land use applications. She attached copies of the face pages of certain of plaintiff's submissions and certified that consistent with her usual procedure, her handwritten notes on those documents accurately evidenced the dates on which she received them from plaintiff. Specifically, Mackner certified that she received both a "Legal Description Rider" and a "Fiscal Impact Report" on October 28, 1998, but that she received plaintiff's "General Development Plan" for Block 600, Lots 2, 2.02 and 4, prepared by Brian A. Mitchell, plaintiff's engineer, and dated October 28, on November 2, 1998.
[3] The attorney noted that in addition to the deficiencies identified by Engelbrecht, Augustyn and Karabashian, ECLLC still had not provided the appropriate escrow fees for the project. Counsel reiterated the Board's position regarding the escrow fee issue in a follow-up letter to ECLLC dated December 17, 1998. At oral argument, however, we were advised that the Board does not rely on the escrow fee issue to support its determination that the application was incomplete, and we therefore do not address the question of the appropriate escrow fee.
[4] R. 4:49-2 requires service within twenty days; the rule does not explicitly refer to "filing."
[5] Neither the judge nor plaintiff's counsel have ever disputed the accuracy of the Board's counsel's August 8 cover letter directed to the judge, marked "VIA HAND DELIVERY," enclosing the original notice of motion. August 8 was exactly twenty days after July 19. Thus even if defense counsel had received the order for summary judgment immediately, and apparently they did not receive it until August 1, the notice of motion for reconsideration would have been timely.
[6] The parties were involved at the same time in a federal lawsuit brought by plaintiff alleging that defendants' actions were in violation of the Fair Housing Act 42 U.S.C. § 3604(a) (1994). We are informed by United States District Court Judge Pisano's written decision and opinion, dismissing that case on summary judgment, that several other related lawsuits brought by plaintiff against the Township or its officials were pending at the time.
[7] "A general development plan may include, but not be limited to the following:...." N.J.S.A. 40:55D-45.2 (emphasis added).
[8] See Cox, § 26-7.
[9] Even a rough calculation of the effect of adding 577 housing units, if we assume an average of 2.5 persons per unit, would add more than 1400 residents to a town with an existing population of approximately 6,000.