951 A.2d 970

AMERADA HESS CORPORATION, NOW KNOWN AS HESS CORPO-
RATION, PLAINTIFF–RESPONDENT, v. BURLINGTON COUN-
TY PLANNING BOARD, DEFENDANT–APPELLANT.

Argued April 8, 2008—Decided July 16, 2008.

617

*Anthony T. Drollas, Jr.*, argued the cause for appellant (*Capehart Scatchard*, attorneys).

*Donna M. Jennings* argued the cause for respondent (*Wilentz, Goldman & Spitzer*, attorneys).

Justice LONG delivered the opinion of the Court.

At issue on this appeal is the meaning of *N.J.S.A.* 40:27–6.7, a provision of the County Planning Act (CPA) that directs that a completed land use application is automatically deemed approved if the county planning board fails to take official action within thirty days, or within sixty days if both the municipal planning board and the applicant consent. There is no provision in the CPA for an extension of those time limits.

In *Manalapan Holding Co. v. Planning Board of Hamilton*, 92 *N.J.* 466, 457 *A.*2d 441 (1983), in interpreting an automatic approval provision in the Municipal Land Use Law (MLUL), we underscored the Legislature's clear intent to require planning authorities to adhere to the strict statutory timetables established for approval and condemned permissive interpretation of such statutes. We also recognized a narrow exception for cases in which a planning board's violation of the statutory time frame was inadvertent or unintentional. In such instances, we held that automatic approval would not advance the legislative goals underlying the statute.

Here, the Burlington County Planning Board (the County Board) argues that automatic approval is only appropriate as a remedy for bad-faith violations of the statute and that, so long as a planning body continues to engage in good-faith dealings with the applicant, automatic approval is unwarranted regardless of how much time has passed. The lower courts disagreed, as do we.

The purpose of automatic approval is to require planning boards to make prompt decisions to benefit the applicant, the objectors, and the public at large. The Legislature obviously considered those values to be significant enough to put in place a strong automatic approval remedy with no exceptions. To interpret *N.J.S.A.* 40:27–6.7 as the County Board suggests—that it was entitled to disregard the statutory time frames because it was continuing its dealings with the applicant and seeking further revisions of the proposal—would eviscerate the scheme. To the contrary, we hold, as we did in *Manalapan,* that the statutory time constraints are to be strictly applied. In other words, under the CPA, if a county planning board fails to render a timely decision, the application is subject to automatic approval unless the board can establish that the delay was inadvertent or unintentional.

In this case, the County Board failed to act within the timetable set forth in *N.J.S.A.* 40:27–6.7, and the applicant's site plan was deemed approved. Because the County Board's delay was neither inadvertent nor unintentional, we now affirm.

I

Hess Corporation (Hess) operates a gasoline station at the intersection of County Route 541 (also known as Mount Holly Road) and Cadillac Road in Burlington Township.[1] Hess acquired the development rights to an 18,679 square foot adjoining parcel and planned to use the site to modify its existing service station

[1] Because Hess succeeded on its motion for summary judgment, we outline the relevant facts in the light most favorable to the County Board.

and to construct a minimart with related site improvements. The adjoining parcel abuts Burlington Bypass (the Bypass)—a bifurcated portion of County Route 541 constructed to move traffic around the congested parts of the area.

Because Hess's plan for the adjacent property included a one-way egress driveway onto the Bypass, which is a county road, it needed to obtain county and municipal approval. On February 6, 2003, Hess's engineer John Rea met with County Board engineers Thomas Jaggard and Martin Livingston to discuss the concept plan and Bypass egress. On August 7, 2003, Livingston informed Rea that the County was in the process of conducting a traffic and safety study of the Route 541 corridor and would be unable to approve the Bypass egress or make any recommendations regarding the site plan for approximately three to six months.

Approximately six months elapsed and on February 24, 2004, Rea again met with Livingston. At that meeting, Livingston voiced a preference for Hess's design plan that featured a narrow, angled one-way egress to the Bypass, but took no action regarding the proposal. On April 15, 2004, Rea sent a memorandum to Jaggard, stating that "Hess Corporation is eager to submit revised plans to the County and Burlington Township and just wants to make sure that your engineering staff does not have any additional preliminary comments on the plans." The engineer's office apparently did not respond until August 5, 2004, notifying Hess that it should submit an application for informal review.

On September 13, 2004, Hess complied and filed an informal site plan application. On October 18, 2004, John A. Engle, the principal engineer of the County Board, sent a letter to Hess's attorney, advising Hess that it would also need to obtain approval from the Burlington County Board of Chosen Freeholders for access. The letter reiterated that the County anticipated making major changes in the area, but was "not exactly sure what the final design will be at this point." With no agreement in sight, Hess decided to finalize its site plan and formally file applications with both the Township and County Boards.

On July 12, 2005, Hess filed a formal application with the County Board, seeking approval to demolish the existing structures on the adjoining parcel and to construct a 2,480 square foot Hess Express Minimart, eight gasoline dispensers, parking spaces, and related site improvements. The application included the plans for a one-way egress onto the Bypass. The next day, Hess filed an identical application with the Burlington Township Planning Board (the Township Board) for preliminary and final major site plan approval and several bulk variances.

On July 29, 2005, the County Board deemed Hess's application incomplete and requested additional information and the balance of the application fee. Hess submitted the necessary information and fee, and the application was deemed complete on August 10, 2005. After a request from the Township Board for further information, Hess's municipal application was deemed complete on August 23, 2005.

On September 1, 2005, Engle contacted Thomas Pugsley, a site designer for Hess, and provided Pugsley with technical review comments on the application. The engineer's office apparently took issue with several aspects of the site plan, and Engle informed Pugsley that his office intended to recommend to the County Land Development Review Committee that it disapprove the application. Additionally, during that conversation, Engle requested an extension of the thirty-day review period, which was to expire September 12, to perform a more comprehensive analysis of the site plan proposal. Pugsley notified Engle that he would relay the request to Hess's counsel and that a representative would respond.

With the thirty-day trigger looming and not having received a response to its request for an extension, Engle sent a letter to Hess on September 6, 2005, memorializing the review comments that had been conveyed to Pugsley. The specific comments were as follows:

*Traffic Comments*

1. The Burlington ByPass (ByPass) between Burlington–Mount Holly Road (CR 541) and Cadillac Road may be modified in the future and have some reduced usage by traffic if changes are made that would relocate vehicles to bypass this section. The applicant should be aware of this because it may affect the access to their site in the future.

2. The traffic counts were not included in the study for the PM peak hours.

3. The applicant will need to have Freeholder approval for the exit only drive on the ByPass. This is necessary because the property has access on another road besides the ByPass. The applicant's traffic engineer should make a comparison and discuss the pros and cons of having access on the ByPass and not having access on the ByPass. This is needed in order to justify access on the ByPass.

4. Attached is a copy of an Interoffice Memorandum dated August 9, 2005 from Marty Livingston to John Engle on the Traffic report prepared by McDonough and Rea Associates, Inc. for the above referenced application.[2]

*General*

5. A seven (7) foot wide section of right-of-way (ROW) across the lot 7 frontage on CR 541 should be dedicated to Burlington County to make the ROW uniform along the road.

6. There is an existing traffic sign along CR 541, near the common property line of lots 7 & 7.02. It should be shown on plan. It may be affected by the proposed driveway.

7. The existing type B inlet on the southern driveway of CR 541 is proposed to be converted to a type A inlet (per detail 2 on sheet 10). There is a difference in the capacity between type B inlets and type A inlets. Can the type A inlet handle the runoff? Hydraulic calculations should be provided that show that the proposed inlet can handle the runoff.

8. The proposed shade trees along the CR 541 frontage should be moved back to make sure they are not planted within the ROW.

9. There are several sections of damaged curb along the CR 541 frontage that should be repaired.

10. If the access is approved, the following should be addressed:

 a. The minimum angle a one-way commercial access should have is sixty-degrees (60°). The proposed access measures close to fifty-degrees (50°). Its angle should be increased to comply with the County's minimum standards.

 b. A sight triangle should be shown for its entire length.

11. Explanation is needed concerning the "Area of Unclear Title."

---

[2] Livingston's memo of August 9, 2005, reiterated concerns over long term plans of the County that could affect the Bypass and noted that the required sight distance of 550 feet was not satisfied by Hess's proposal.

Upon learning of the County Board's position from Pugsley, Hess's counsel, Donna Jennings, called Engle on September 7, 2005, and requested that the engineer's office delay submitting its review comments to the Land Development Review Committee until after Hess appeared before the Township Board on September 15, 2005. Jennings was concerned that the comments would negatively impact the Township Board's treatment of its application. Jennings asserts that at no time during that phone call did she grant an extension of time for the County Board to act on Hess's application. On the contrary, according to Engle's certification, after he faxed a copy of his September 6 letter to Jennings, he "had a second telephone conversation with Jennings during which she granted an extension of the review period until thirty days after the receipt of plans that were revised in accordance with [his] Review comments." According to Engle, because "the extension was granted and revised plans were to be submitted" it was no longer necessary to take action within the statutory thirty-day time limit.

On September 16, 2005, the Township Board held a public hearing on Hess's proposal. At the hearing, Rea testified that the proposed Bypass egress was positioned for adequate sight distance to allow for safe egress onto the Bypass. The Township Board's traffic consultant initially disagreed and recommended that the Bypass access be denied for safety reasons. In response to the traffic consultant's concerns, on September 29, Hess submitted a supplemental traffic report, involving actual measurements of the sight line, concluding that the Bypass egress was safe. Hess simultaneously sent that information to Livingston in response to his August 9 memorandum. At the second public hearing on October 13, 2005, the Township's traffic consultant agreed that the proposed exit was safe.

During the second hearing, the Township Board questioned Jennings on the status of Hess's county application. Jennings did not inform the Township Board of the County engineer's review comments, but said "they were working on it" with the County

Board. At the conclusion of the public meeting, the Township Board approved Hess's construction application pending County Board approval.

In anticipation of the December 15 meeting at which the Township Board was to adopt a written resolution memorializing its prior approval of the Hess application, Rea wrote to Engle on December 13, 2005. The letter included the information that had been provided to the Township Board and to Livingston and reiterated Hess's conclusion that the Bypass access was safe as originally designed. The letter ended with the request that: "if you require any additional information or have any questions, please contact us and we will provide you with the necessary materials." According to Engle, the County Board viewed the letter as confirmation of Jennings's grant of an extension of the application review period and awaited a revised plan.[3]

Three months later, on February 8, 2006, the County Board sent Hess a letter, stating again that it was "not in favor of the proposed access from the Hess gas station onto the Burlington By-Pass." The letter, which did not mention that the County Board had been expecting revised plans, essentially kept the matter open by inviting Hess to attend a public information meeting on February 21, 2006.

Having obtained no formal action by the County Board on its application, which was deemed complete on August 10, 2005, and having received no communications from the County Board between September 7, 2005, and February 8, 2006, Hess filed an action in lieu of prerogative writs on February 15, 2006.[4] The

[3] On December 15, the Township Board approved the Hess proposal by resolution that, among other things, adopted Rea's conclusion that the proposal provided an unobstructed sight distance of 580 feet from the Bypass to the location of the Hess driveway.

[4] Under *N.J.S.A.* 40:27-6.5, applicants for automatic approval must request the County Board secretary to "attest on the plat to the failure of the county planning board to report within the required time period...." The record here

complaint sought a declaration that the County Board's inaction had triggered automatic approval of its application under *N.J.S.A.* 40:27–6.7. Hess moved for summary judgment.

In ruling in favor of Hess, the trial judge relied on *N.J.S.A.* 40:27–6.7, concluding that once a site plan application is deemed complete, one of four specific results must occur: (1) county approval; (2) county disapproval for reasons specified in a report to the municipal authority; (3) an agreement between all parties for a thirty-day extension within which action must occur; or (4) automatic approval due to failure to act within thirty days. The judge found that the County Board "purposefully delayed" reviewing the application and made "one demand after another" to avoid final action. According to the judge, that intentional delay warranted automatic approval and distinguished the case from others in which automatic approval had been denied.

The County Board appealed, and the Appellate Division affirmed, substantially for the reasons expressed by the trial judge, adding only that the public safety exception identified in *D'Anna v. Planning Board of Township of Washington,* 256 *N.J.Super.* 78, 84, 606 *A.*2d 417 (App.Div.), *certif. denied,* 130 *N.J.* 18, 611 *A.*2d 656 (1992), was not implicated here because the site plan was already deemed safe by the Township Board. The County Board filed a petition for certification that we granted. 192 *N.J.* 479, 932 *A.*2d 30 (2007).

## II

The County Board argues that it obtained an extension from Hess; that even if an effective extension was not granted, automatic approval is inappropriate absent a showing that it engaged in bad faith, purposeful delay, or inattention; that Hess waived its right to automatic approval because it failed to invoke the automatic approval provision immediately upon the expiration of the

---

does not reveal whether that was done. However, that issue has not been raised before us.

statutory time limits and gave no notice of its intention to do so; that the automatic approval provision cannot be triggered where, as here, a proposal presents questions of public safety; and that the appellate panel erred in suggesting no county-specific concerns could exist where the plan has already been approved by a municipal traffic study. Finally, it maintains that summary judgment was unwarranted because there are genuine issues of material fact regarding whether Hess agreed to an extension and whether the County Board purposefully delayed in reviewing the application.

Hess counters that automatic approval in this case was based on well-settled principles of law; that the clear and unambiguous statutory timetable was violated by the Board; that no traffic safety issue can exist in a case in which the municipal authorities have already grappled with the identical issue and granted approval; that the County Board failed to obtain an extension; that even if it had done so, the extension would have expired long before the request for automatic approval; that a developer is under no obligation immediately to invoke the automatic approval provision, nor to affirmatively inform a planning board of its intention to do so; that this is not a case of unintentional delay or inadvertence; and that summary judgment was properly entered in its favor.

### III

#### A.

The MLUL serves as the predominant governmental tool for insuring that development in the state is carried out in a manner that best serves the public health, safety, and general welfare. As its name indicates, the MLUL outlines the procedural steps for municipalities to effectuate principled development, including the review process for site plan applications. When a site plan involves land development along a county road or affecting a county drainage facility, the impacted county may, but need not, interject itself into the planning procedure. That process is set

forth in the CPA, *N.J.S.A.* 40:27–1 to –12, a statute that, in a general way, parallels the MLUL in respect of county development. Namely, if the county has chosen to create a planning board pursuant to *N.J.S.A.* 40:27–1, an applicant must submit its proposal to the county board for review of the potential impact of the application on county resources, limited to questions of traffic and drainage. Under those circumstances, the municipality must either defer final action on an application until receipt of the county report or grant approval of the application subject to county approval. *N.J.S.A.* 40:27–6.3; *N.J.S.A.* 40:55D–37(c); *Manalapan, supra*, 92 *N.J.* at 477–78, 457 *A.2d* 441.

Within the MLUL and the CPA, the Legislature has included several strict timetables for approval decisions. *See, e.g., N.J.S.A.* 40:55D–46 (45 days for municipal review of site plan application for 10 acres or less, 95 days for municipal review of site plan application for 10 acres or more); *N.J.S.A.* 40:55D–48 (45 days for municipal review of minor subdivision application, 95 days for municipal review of major subdivision application); *N.J.S.A.* 40:55D–67 (95 days for municipal review of application for conditional use); *N.J.S.A.* 40:55D–73 (120 days for municipal board of adjustment review of application for development). Unless an extension has been granted, failure to act within the statutory time period "shall" result in automatic approval of the application. *See, e.g., N.J.S.A.* 40:55D–48 (using mandatory language).

Germane to this case, *N.J.S.A.* 40:27–6.7 provides:

> The municipal or other local agency or individual with authority to approve the site plan or issue a building permit shall defer action on any application requiring county approval … until the same shall have been submitted to the county planning board for its approval of the site plan. *The county planning board shall have 30 days from the receipt of a site plan to report to the appropriate local authority. In the event of disapproval, such report shall state the specific reasons therefore. If the county planning board fails to report to the municipal approving or issuing authority within the 30-day period, said site plan shall be deemed to have been approved by the county planning board.* Upon mutual agreement between the county planning board and the municipal approving authority, with approval of the applicant, the 30-day period may be extended for an additional 30-day period.

[ (Emphasis added); *see also N.J.S.A.* 40:27–6.3 (establishing timetable for county subdivision review); *N.J.S.A.* 40:27–6.5 (outlining procedural steps for seeking county certification).]

On its face, the statute requires a county planning board to act within thirty days. That short time frame recognizes that the primary responsibility for approval reposes in the municipality and that county delay will impact that process. It is for that reason that it is only with the municipality's consent that a single thirty-day extension, approved by the applicant, can be granted. In all, then, the Legislature has afforded the county sixty days, at the outside, to act on a development application. That tight timetable contrasts with the MLUL provisions that authorize extensions for "such further time as may be consented to by the applicant." *N.J.S.A.* 40:55D–45.3; *N.J.S.A.* 40:55D–46.1(a); *N.J.S.A.* 40:55D–47; *N.J.S.A.* 40:55D–48(c); *N.J.S.A.* 40:55D–50(b); *N.J.S.A.* 40:55D–61; *N.J.S.A.* 40:55D–67(a); *N.J.S.A.* 40:55D–73(b); *N.J.S.A.* 40:55D–76(c).

We note that, under the predecessor to the MLUL, when a planning board failed to act within the statutory timetable, that inaction had the equivalent effect of a denial. *N.J.S.A.* 40:55–39.1. That turned out to be an inadequate remedy because the spectre of denial resulted in developers essentially having no choice but to grant extension after extension with concomitant delays and costs.

The Legislature later converted the failure to decide from an automatic denial to an automatic grant. *Lizak v. Faria,* 96 *N.J.* 482, 492, 476 *A.*2d 1189 (1984). The purpose of that change was to exert pressure on boards to act with dispatch on pending applications. Indeed, the Legislature has continuously provided legal remedies to guard against municipal delay and inaction and to cultivate a transparent and expedient planning process. As we stated in *Lizak v. Faria,*

Notwithstanding constant changes in direction, the Legislature has consistently retained certain elements as essential to the statutory scheme for land use development. One of those elements is the encouragement of prompt consideration of land use applications. Although the consequences of delay have varied over the years, the Legislature clearly frowns upon municipal inaction.

[*Id.* at 496, 476 *A.*2d 1189.]

Prior to 1979, however, public agencies were able to finesse the time limitations in the land use statutes because the MLUL lacked a definition of the term "completed application." Without rules regarding when an application was deemed complete—and thus when the clock began to run—planning bodies avoided the timetables by simply deeming applications incomplete and perpetually seeking additional information. William M. Cox, *New Jersey Zoning and Land Use Administration* § 25–1.1 at 567 (Gann 2007) ("Instead of promoting the purpose of the Act, which was primarily to provide for prompt consideration of applications filed with municipal agencies, many municipal agencies used the concept of incompleteness to prevent the clock from ever starting to run, simply by holding that the application was incomplete. . . ."); David J. Frizell, 36 *New Jersey Practice: Land Use Law* § 14.2 at 276–77 (3d ed.2005) (noting delay based on "frivolous deficiencies"). In 1979, the Legislature began its march toward defining when an application is complete. The statute was amended in 1984 and now declares an application complete upon submission of all "information indicated on a checklist adopted by ordinance and provided to the applicant," and by prescribing that, if an application is not certified as complete within forty-five days, "[it] shall be deemed complete," the Legislature established strict triggering points "for purposes of commencing the applicable time period. . . ." *N.J.S.A.* 40:55D–10.3.

Thus, between statutory time limits, rules governing when an application is complete, and automatic approval provisions, the Legislature has created a seamless statutory scheme, the obvious aim of which is to assure speedy land use decisions and to protect against the lassitude and indolence that had previously taken hold. It is against that expression of legislative will that the issue in this case must be evaluated.

### B.

Automatic approval in the land use field has been the subject of considerable judicial scrutiny. The seminal decision that sheds

light on the issue before us is *Manalapan Holding Co. v. Planning Board of Hamilton*, 92 N.J. 466, 457 A.2d 441 (1983), which involved the interplay between the ninety-five-day time limit on municipal major subdivision applications and the thirty-day county review process. In *Manalapan*, after hearings and rehearings, the applicant obtained county board approval, and the township then scheduled a special meeting for October 30, 1980, to consider the application. Realizing the approval time frame was set to expire on October 26, the township board secretary called the applicant on October 24 to request an extension. The applicant refused and, instead of attending the October 30 meeting, delivered a letter declaring that it had obtained automatic approval due to the board's inaction. The trial judge ruled in favor of the applicant, and a divided appellate panel affirmed.

On review, we agreed that the time frames in both statutes had to be strictly adhered to and urged simultaneous consideration by both boards. In particular we observed that "a municipality's decision to defer action while awaiting county approval cannot serve unilaterally to extend the 95–day statutory period for municipal action." *Id.* at 478, 457 A.2d 441.

In reversing, however, regarding automatic approval, we noted that the board had relied on a reasonable, although incorrect, interpretation of the statutes, essentially operating under the mistaken view that it was not required to begin to consider an application until the county board had acted. We viewed the delay, therefore, as unintentional and held the matter to be outside the heartland of cases the Legislature intended to capture within the automatic approval provision. In so doing, we said

> [t]he course of events created by both parties bespeaks inadvertence, ignorance or misunderstanding as to the operation and mechanics of the statute in triggering the extension period and preserving the opportunity for a public hearing on a preliminary subdivision application.... [Not granting automatic approval] better serves the public interest and does not treat the applicant unfairly.
>
> [*Id.* at 481–82, 457 A.2d 441.]

Although we sided against automatic approval, we made the following unequivocal statement:

> We hasten to add that by this result we do not countenance a permissive interpretation or application of the statute. The statute prescribes strict timetables and a careful methodology. It does not imply waiver or relaxation of its terms. *This opinion now clarifies and makes explicit the requirements of the statute with respect to the manner and time within which a municipality must act upon an application for preliminary subdivision approval. Consequently, we do not anticipate that in the future, even under a similar pattern of conduct, would a public hearing upon a preliminary subdivision application still remain available once the statutory periods for municipal action had expired without a clear valid extension.*

[*Id.* at 482, 457 A.2d 441 (emphasis added).]

Thus, despite the remand, we made clear that that would not be the result, even under the same fact pattern, in future cases. In other words, after *Manalapan,* public entities could no longer claim confusion over the operation of the strict timetables in the land use planning approval statutes.

The following year, in *Lizak, supra,* a planning board orally denied an application in September 1979, but neglected to provide a written resolution within 120 days of its final decision, an essential element of the then-applicable MLUL provision. As of June 1980, when the applicant sought automatic approval, the board had still not taken further action. We held that that unexplained delay justified automatic approval, but the applicant's failure to abide by the statutory notice procedure paved the way for a timely appeal.

Over the last few decades, the Appellate Division has also had occasion to apply *Manalapan* in various land use cases, and, in so doing, has added meat to the bones of that decision. For example, in *Allied Realty, Ltd. v. Borough of Upper Saddle River,* 221 N.J.Super. 407, 534 A.2d 1019 (App.Div.1987), *certif. denied,* 110 N.J. 304, 540 A.2d 1284 (1988), a developer sought automatic approval under the MLUL, contending that a planning board had failed to take official action within the prescribed statutory time period. The planning board argued that the application was barred by its prior denial of a similar proposal, and the trial judge agreed.

The Appellate Division reversed, concluding that *res judicata* did not necessarily bar review of the application and that the planning board had to provide the applicant with an opportunity to demonstrate a change in circumstances. However, because the board's mistaken belief regarding the reviewability of the application was "entirely reasonable," the court concluded that the board's failure to act within the time constraints of the statute was unintentional. *Id.* at 419, 534 *A.*2d 1019. Under those "rather peculiar circumstances," the panel held that the aims of the statute would not be advanced by automatic approval. *Id.* at 413, 534 *A.*2d 1019; *see also Sprint Spectrum, L.P. v. Zoning Bd. of Adj. of Green Brook,* 356 *N.J.Super.* 194, 811 *A.*2d 956 (Law Div.2002) (holding where there was no evidence of intentional delay by zoning board automatic approval was unwarranted).

Likewise, in *Eastampton Center, L.L.C. v. Planning Board of Eastampton,* 354 *N.J.Super.* 171, 805 *A.*2d 456 (App.Div.2002), the Appellate Division was faced with a trial judge's grant of automatic approval where the planning board's inaction stemmed from its belief that the application was incomplete. There, the applicant sought township approval for its general development plan (GDP) with respect to which the MLUL sets forth a detailed checklist of items that may be required as part of the review process. *N.J.S.A.* 40:55D–45.2. At the time of the application, the planning board had not yet adopted a GDP checklist by ordinance. Instead, when the application was submitted without several of the items listed in the MLUL, the board simply requested the additional information and deemed the application incomplete without it. The applicant countered that because the township had not formally adopted a checklist, it was without authority to declare the application incomplete. The trial judge agreed with the applicant and granted automatic approval.

The Appellate Division reversed. On the substantive issue, the panel sided with the board and determined that the application was, in fact, incomplete. In dictum, the panel observed that even if the board had erred in finding the application incomplete, its

belief to that effect, which was based on the advice of its professional planner, was reasonable. Thus, its failure to act within the statutory deadline would, in any event, have been inadvertent and unintentional. *Eastampton, supra,* 354 *N.J.Super.* at 195, 805 *A.*2d 456 (citing *Allied Realty, supra,* 221 *N.J.Super.* at 419, 534 *A.*2d 1019).

A similar result was reached in *Fallone Properties, L.L.C. v. Bethlehem Township Planning Board,* 369 *N.J.Super.* 552, 568–71, 849 *A.*2d 1117 (App.Div.2004), where the Appellate Division affirmed the trial judge's denial of automatic approval in a case in which the municipal delay was based on the board's belief that *N.J.S.A.* 40:55D–10.3 requires consent of a property owner where a contract purchaser had applied for an approval. That belief led the board to conclude that the application was incomplete. Because the board's legal misimpression was a reasonable one, the Appellate Division held that its delay was inadvertent.

The Appellate Division has also relaxed the automatic approval rule where board inaction stemmed from mishaps or technical mistakes. For example, in *D'Anna, supra,* the Appellate Division declined to grant automatic approval in a case in which the planning board failed to act because a substitute clerk lost the resubmitted plans. 256 *N.J.Super.* at 83, 606 *A.*2d 417. In so ruling, the panel noted that, "[t]his is simply a case of innocent inadvertence on the part of the Board's employee who was filling in for the Clerk." *Ibid.*

That conclusion was presaged in *Precision Industrial Design Co. v. Beckwith,* 185 *N.J.Super.* 9, 447 *A.*2d 186 (App.Div.), *certif. denied,* 91 *N.J.* 545, 453 *A.*2d 863 (1982), a case that preceded *Manalapan.* There, a municipal planning board orally denied approval of an application and scheduled a timely meeting to take "formal action" to that effect. In anticipation of the meeting, and in accordance with *N.J.S.A.* 10:4–8, the planning board posted a notice that it delivered to two newspapers and filed with the municipal clerk. "The notice, however, and obviously inadvertently, neglected to state the place of the meeting or the hour of its

convening." *Id.* at 13, 447 *A.*2d 186. That deficiency, in turn, voided the formal action under the Open Public Meeting Law. *Id.* at 14, 447 *A.*2d 186 (citing *N.J.S.A.* 10:4–15(a)). Yet, the appellate panel declined to allow that technical oversight to transform the oral denial into an approval. "We are persuaded that the legislative purpose in enacting the automatic approval mechanism would be unjustifiably distorted in a manner patently subversive to the public interest if a technical defect attendant upon an express decision to deny a development application were permitted to convert the denial into an approval." *Id.* at 18, 447 *A.*2d 186.

Broadly then, our decisional law has identified at least two scenarios that will satisfy the *Manalapan* exception. The first is delay caused by ordinary mishaps or mistakes, such as omitting the place of a board meeting, thus invalidating a public notice, *Precision Indus., supra,* or misfiling an application, *D'Anna, supra.* The second category is delay caused by a reasonable misapprehension regarding whether there was a complete application pending before the board, for example where the board thought the application was barred by *res judicata, Allied Realty, supra;* where the board believed that an application failed to satisfy the MLUL checklist and thus considered it incomplete, *Eastampton, supra;* or where the board believed that consent of the property owner was necessary to perfect an application filed by a contract purchaser, *Fallone, supra.*

█ It is unlikely that we have completely mined the vein of excusable delay. However, one thing is clear-what is not excusable after *Manalapan* is claimed confusion over the applicability and operation of the actual time limits within the automatic approval statutes themselves. *See Manalapan, supra,* 92 *N.J.* at 482, 457 *A.*2d 441 ("This opinion now clarifies and makes explicit the requirements of the statute with respect to the manner and time within which a municipality must act upon an application for preliminary subdivision approval."). In short, we presume that boards are fully familiar with the time constraints in the approval

statutes, including the method for obtaining extensions and the limits thereon.

Although commentators have concluded from that jurisprudential history that courts are "very reluctant" to affirm the automatic approval remedy, Frizell, *supra*, § 14.28 at 316; Cox, *supra*, § 26–3 at 574 (finding courts "reluctant" to affirm absent purposeful delay), in the absence of mistake, inadvertence, or other unintentional delay, there should be no such reluctance. Indeed, *South Plainfield Properties, L.P. v. Middlesex County Planning Board*, 372 *N.J.Super.* 410, 859 *A.2d* 463 (App.Div.2004), is emblematic of our view. There the board simply granted itself a six-month delay to review "extenuating" traffic concerns and impacts, and the Appellate Division had no hesitation in holding that the action was "precisely the conduct that the automatic approval provision was designed to prevent." *Id.* at 419, 859 *A.2d* 463.

That is what the Legislature intended. It has made the policy judgment that timely disposition is of great institutional value such that automatic approval is the proper remedy for delay. Under *Manalapan*, the statutory timetables are to be strictly enforced; permissive interpretation is unwarranted; and only where delay is inadvertent or unintentional will a public entity be excused from automatic approval.

■ The reason those limited exceptions have been carved out is obvious: "application of the statutory time constraints must be anchored in the reason for their existence." *Allied Realty, supra*, 221 *N.J.Super.* at 418, 534 *A.2d* 1019; *S. Plainfield Props., supra*, 372 *N.J.Super.* at 419, 859 *A.2d* 463. In other words, the statute should be interpreted to advance rather than thwart the goals underlying it. It follows that where delay is unwitting or has been caused by technical mistake, the evil that the statute was designed to remedy is not present. In those circumstances, automatic approval is unwarranted.

To be sure, over the years, the proverbial water has been muddied by loose language in the opinions, including *Manalapan*,

suggesting that the applicant must separately demonstrate bad faith on the part of the planning board in order to obtain automatic approval. *See, e.g., Manalapan, supra,* 92 *N.J.* at 481, 457 *A.*2d 441 (denying automatic approval, in part, due to "no suggestion of bad faith, prevarication, or obstructionism by the municipality"); *Eastampton, supra,* 354 *N.J.Super.* at 194, 805 *A.*2d 456 (identifying "whether there was evidence of bad faith or obstructionism by the municipality" as a factor to be weighed in assessing enforceability of automatic approval provisions); *D'Anna, supra,* 256 *N.J.Super.* at 83, 606 *A.*2d 417 ("Absent evidence of bad faith on the part of the Board ... automatic approval of the preliminary subdivision application should not have been granted."). Such statements confuse the issue, run counter to the legislative command, and cast the burden on the wrong party.

We presume that boards act in good faith. However, they must also act within the statutory timetables. When the application is deemed complete, the clock begins to run. Where a board fails to act within the statutory limits, even for what it considers "good" reasons, the statute is violated and automatic approval comes into play. Only where the board establishes that its delay was inadvertent or unintentional can its conduct be excused. That is the backdrop of our inquiry.

## IV

### A.

The County Board first contends that it was not required to render a final decision within thirty days of receiving the completed application because Hess granted it an extension that stopped the clock. We return to the language of *N.J.S.A.* 40:27–6.7:

> The county planning board shall have 30 days from the receipt of a site plan to report to the appropriate local authority.... If the county planning board fails to report to the municipal approving or issuing authority within the 30–day period, said site plan shall be deemed to have been approved by the county planning board. *Upon mutual agreement between the county planning board and the municipal*

*approving authority, with approval of the applicant, the 30-day period may be extended for an additional 30-day period.*
[ (Emphasis added).]

Because the County Board's power to effectuate planning stems from legislative allowance, it must be exercised in strict conformity with the delegating enactments-the CPA and the MLUL. *Toll Bros., Inc. v. Burlington County Bd. of Chosen Freeholders,* 194 *N.J.* 223, 944 *A.*2d 1 (2008); *see also Kode Harbor Dev. Assocs. v. County of Atl.,* 230 *N.J.Super.* 430, 440, 553 *A.*2d 858 (App.Div. 1989)* ("[A] county's powers are restricted to those granted to it by the Legislature."). Strict conformity mandates that planning boards complete their review processes within the legislatively specified time period—in this case, thirty days from the date the application was deemed complete.

*N.J.S.A.* 40:27–6.7 sets forth a clear timetable for approval, the method by which it can be extended, and the consequences of violation. To comport with the statute, the County Board was required to act within thirty days of August 10 (the date on which it deemed the Hess application complete) or within thirty days of September 12, if an extension *from the municipality and the applicant* was obtained.

In the context of county site plan approval, the statute clearly envisions an interested party beyond the applicant, as the requirement of municipal approval of any extension underscores. Municipalities have primary responsibility for planning approval and have their own MLUL timetables. Thus they must consent to any extension that could potentially impact their own processes.

As we have said, *N.J.S.A.* 40:27–6.7 is different from the MLUL insofar as the MLUL provides for the grant of extensions for "such further time as may be consented to by the applicant." *N.J.S.A.* 40:55D–46.1(a). The Legislature obviously knew how to provide temporal flexibility to the primary planning entity and chose not to do so in the CPA. We ascertain therefrom an intention that a county board be bound by the particularized timetables in the CPA, and that an applicant is powerless without

municipal approval to extend the time limits. Because the County Board here did not request an extension from the municipality, and because Hess could not unilaterally extend the time for County Board action, there is no support for the County Board's conclusion that it obtained a statutorily-compliant extension.

## B.

The County Board next argues that it was permitted to postpone its final decision until it examined all information it deemed relevant and, therefore, it was entitled to delay a decision until it received the requested additional information and revisions from Hess, regardless of the time limits in the statute.

As we have said, when the Legislature amended the MLUL in 1984 to provide guidance for when an application must be deemed complete, it addressed the very situation at issue here. *N.J.S.A.* 40:55D–10.3. The statute specifically authorizes planning boards to request additional information, but makes clear that seeking such information will have no bearing on the completeness of the application: "The application shall not be deemed incomplete for lack of any such additional information or any revisions in the accompanying documents so required by the municipal agency." *N.J.S.A.* 40:55D–10.3. Because there is no basis to conclude that the Legislature intended the term "complete application" to have a different meaning in the MLUL and in the CPA, see *N.J.S.A.* 40:27–6.1 (incorporating MLUL's "subdivision application" definition into CPA); *Builders League of South Jersey, Inc. v. Burlington County Planning Board,* 353 *N.J.Super.* 4, 23–24, 801 *A.*2d 380 (App.Div.2002) (equating policy considerations governing MLUL and CPA), once an application is deemed complete, a county planning board must act within thirty days irrespective of any additional information sought or revisions requested. In this case, it is undisputed that that occurred on August 10, 2005, when the County Board certified Hess's application as complete.

To be sure, a planning body has discretion in determining what information a developer must supply. Indeed, planning boards may even cite a developer's unwillingness to provide information as a rationale for denying the application. Cox, *supra*, § 25–2.1 at 571 ("[I]f the applicant unreasonably refuses to furnish these the board may deny the application for that reason."). And if the planning body rejects the application because the developer withheld the information, the reviewing body will determine whether the denial was justified based on the reasonableness of the request. *Id.* at § 25–2.2 at 571–72.

We note, additionally, that when a developer, with the consent of the planning body, withdraws an application or unilaterally amends it to such an extent that effectively it is a new application, the board need not act within the original time constraints. *See Lake Shore Estates, Inc. v. Denville Twp.*, 255 *N.J.Super.* 580, 592, 605 *A.*2d 1106 (App.Div.1991) (viewing substantially amended application as new application for purposes of statutory application), *aff'd o.b.*, 127 *N.J.* 394, 605 *A.*2d 1073 (1992); Cox, *supra*, § 25–4 at 572 ("Where an amended application is very substantially different from the original it may be treated by the board and any reviewing court as a new application.").

Here, the County Board does not claim that Hess actually withdrew or agreed to withdraw its application. Neither does it contend (nor could it) that the matters contained in Engle's September 6 letter were such that only an entirely new application would have sufficed. This is the classic case that the 1984 amendments were intended to address. The County Board was entitled to seek information and revisions from Hess after the application was deemed complete, but was still required to act within the statutory timetable. If the materials were not forthcoming, the application could have been granted without them or denied for lack of them. What was not an option was doing nothing. That is what occurred here.

## C.

 Alternatively, the County Board argues that because Hess behaved in a way that led it to believe that it had been granted an open-ended extension, Hess should be barred from seeking automatic approval. In support, the County Board notes that Hess asked that Engle delay conveying his negative comments until after the Township Board hearing; that Hess represented to the Township Board that it was "working" with the County Board and even submitted a new traffic report to the County after the thirty-day time limit had expired; that Hess did not claim automatic approval immediately upon the expiration of the statutory time clock; and that Hess never gave any inkling that it would seek such approval.[5] According to the County Board, those actions gave rise to a reasonable belief on its part that Hess had acquiesced in an open-ended extension.

The major problem with that argument is that it was laid to rest in *Manalapan, supra,* where we said that a planning board could not assert confusion over the "manner and time within which a municipality must act upon an application...." 92 *N.J.* at 482, 457 *A.*2d 441. Plainly, the County Board could not reasonably have believed that Hess had given it an open-ended extension because it knew or should have known that under the statute, Hess lacked the power to grant such an extension. That is what differentiates this case from fact patterns like *Star Enterprise v. Wilder,* 268 *N.J.Super.* 371, 633 *A.*2d 1001 (App.Div.1993), where a municipal planning board believed it had been granted an extension by an applicant. Under the MLUL, such an extension would have been effective. Contrariwise, as we have said, under the CPA, the

---

[5] Unlike the MLUL, there is no notice requirement in the CPA. Nor is there any time constraint regarding when automatic approval may be sought. However, a county planning board could advance a laches argument under appropriate circumstances. *See, e.g., Knorr v. Smeal,* 178 *N.J.* 169, 181, 836 *A.*2d 794 (2003) (permitting laches claim where party changes position in reliance on opposing party's delay in invoking statutory time limit). No such argument is made here, nor does the record appear to support one.

applicant is powerless unilaterally to extend the approval time. Thus, the County Board cannot shoehorn this case into the reasonable misapprehension category of inadvertence under *Manalapan.*

To be sure, Hess continued its dealings with the County Board after the expiration date in the hope of reaching détente, an outcome that would surely have been preferable to what has occurred here. Indeed,

> [a] developer typically does not want an automatic approval—it would indicate a hostility with the community that would only lead to more trouble with future interactions: building permits, certificates of occupancy and so forth. The developer seeks acceptance and legitimacy. Given a choice, the developer will not force the issue if there is any chance the approval can be obtained.
>
> [Frizell, *supra,* § 14.28 at 318–19.]

It is thus understandable that Hess continued to press for a favorable decision. However, by waiting to enforce the automatic approval provision, Hess neither freed the County Board of all statutory constraints, nor, after a further lengthy delay, was Hess barred from seeking automatic approval. The County Board knew the statutory limits and chose to continue its dealings with Hess, neither approving nor disapproving the application. In so doing, it acted at its peril.

### D.

We turn finally to the County Board's contention that there is a health and safety metric in the automatic approval calculus. In particular, the County Board argues that automatic approval cannot occur where any health or safety issue is outstanding. *See D'Anna, supra,* 256 *N.J.Super.* at 84, 606 *A.*2d 417 (rejecting automatic approval where "matters vital to the public health and welfare, such as drainage, sewer disposal and waste supply must be resolved before preliminary approval is granted, where the Board has not acted in bad faith"). That conclusion seems to us to be an overstatement that would have the effect of eliminating the automatic approval remedy altogether.

Indeed, in enacting *N.J.S.A.* 40:27–6.7, the Legislature did not distinguish between "good" and "bad" proposals and drafted no exception for cases involving the public health and welfare. The reason for that is likely twofold: because it expected that health and welfare issues, like all others, would be addressed within the time limits imposed by the statute; and because it was aware that even if a county planning board forfeits its own right to exercise police powers by failing to live up to the CPA, any health and safety conditions imposed by the municipality will endure along with comprehensive statewide statutes and regulations regarding health and safety that will continue to be enforceable even after automatic approval. *See, e.g., N.J.S.A.* 6:1–80 (Air Safety and Hazardous Zoning Act); *N.J.S.A.* 39:4–197 to –202 (Powers of Municipalities, Counties and Highway Commissioner under Motor Vehicle and Traffic Act); *N.J.S.A.* 40:55D–95 (Stormwater Management Act); *N.J.S.A.* 58:11A–1 to –16 (Water Quality Planning Act); *N.J.S.A.* 58:11–23 to –48 (Realty Improvement Sewerage and Facilities Act); *N.J.S.A.* 58:16A–1 to –101 (State Flood Control Facilities Act). *See generally N.J.S.A.* 40:55D–22 (conditioning municipal automatic approval upon removal of statewide prohibitions and state agency approval). In short, a project that receives automatic approval at the county level is nevertheless subject to conditions imposed by the municipality and to all relevant statewide health and welfare initiatives.

It may be that some future case will present a compelling issue of safety or welfare that has not been captured by another level of governmental regulation, but in this case, we are not required to declare either the existence or margins of any so-called public health and welfare exception to automatic approval. We are satisfied that the lower courts properly rejected the County Board's traffic safety arguments on the merits, recognizing that the delay in this case was a function of the County Board's acknowledged desire to avoid ruling until the adoption of a future master plan. We see no warrant to reach a different conclusion.

644

## V

To summarize, in enacting the MLUL and the CPA, the Legislature has made a value judgment that expeditious land use decisions are of such benefit to the public and applicants alike that the strong remedy of automatic approval is necessary and appropriate. We held in *Manalapan* that the time frames in the land use statutes are to be strictly applied, that automatic approval is the remedy for purposeful delay, and that it is only when government inaction is unintentional or inadvertent that the time frames are subject to relaxation. We reaffirm those principles here and add that the applicant unilaterally can neither extend nor waive the time limits in the CPA, and that a planning board cannot delay beyond the statutory limits without exposing itself to automatic approval.

## VI

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—6.